# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| FACTOR BIOSCIENCE INC., <br><br> Plaintiff, <br><br> v. <br><br> CELLECTIS, INC., CELLECTIS S.A., ASTRAZENECA PLC, ASTRAZENECA IRELAND LIMITED, ASTRAZENECA HOLDINGS B.V., <br><br> Defendants. | Civil Action No. _____ <br><br> **Jury Trial Demanded** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Factor Bioscience Inc. ("Factor" or "Plaintiff") brings this Complaint for patent infringement against Defendants Cellectis, Inc. ("CI"), Cellectis S.A. ("CSA") (collectively with CI, "Cellectis"), AstraZeneca PLC ("AZ PLC"), AstraZeneca Ireland Limited ("AZ Ireland"), and AstraZeneca Holdings B.V. ("AZ Holdings") (collectively with AZ PLC and AZ Ireland, "AstraZeneca") (AstraZeneca and Cellectis, collectively "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code. This action relates to Defendants' use of Factor's patented technology for producing gene-edited cells using synthetic messenger ribonucleic acid molecules ("mRNA") encoding transcription activator-like effector nuclease ("TALEN") gene-editing proteins, which Cellectis employs both as a research tool as well as for research to identify and design gene-edited cells, including various potential "Universal CAR-T" ("UCART") and .HEAL

1

gene-edited cells. Cellectis has also purported to license its infringing technology to AstraZeneca, which Cellectis uses, at AstraZeneca's instruction and for AstraZeneca's benefit, both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic chimeric antigen receptor T ("CAR-T") cells. Cellectis has also induced and/or contributed to similar infringement by a number of non-party contractual partners seeking to identify, research, and design allogeneic CAR-T cells of their own utilizing technology provided by Cellectis. Such uses infringe Factor's U.S. Patent Nos. 10,662,410 ("the '410 Patent"), 10,829,738 ("the '738 Patent"), and 10,982,229 ("the '229 Patent") (collectively, the "Angel Patents"). Copies of the '410 Patent, the '738 Patent, and the '229 Patent are attached hereto as Exhibits 1-3, respectively.

2.      Factor brings this action following a reasonable pre-suit investigation of the relevant facts. Factor has identified specific publicly-available documents supporting allegations herein, which are cited below and attached as exhibits. Unless stated otherwise, all allegations herein are made on information and belief.

## THE PARTIES

3.      Plaintiff Factor is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 1035 Cambridge Street, Suite #17b, Cambridge, MA 02141.

4.      Factor is a biotechnology company that discovers, researches, develops, manufactures, markets and sells innovative cell reprogramming and gene-editing technologies, including allogeneic CAR-T cells. Among the technologies developed at Factor are pioneering methods that use synthetic mRNA encoding TALENs to produce gene-edited cells. As described in Factor's Technology Catalog, a copy of a relevant version of which is attached hereto as Exhibit 4, Factor's groundbreaking technology provides highly-efficient gene editing, including in primary cells, that can be used to generate allogeneic CAR-T cells in which synthetic mRNA encoding

gene-editing proteins is used to inactivate the endogenous T-cell receptor. Factor's gene-editing technology also offers dramatically higher efficiency than alternative approaches.

5.    On information and belief, Defendant CI is a corporation organized under the laws of the State of Delaware, having a principal place of business at 430 East 29th Street, New York, NY 10016. According to a Cellectis investor presentation, attached hereto as Exhibit 5, CI conducts fundamental research, including gene editing using synthetic mRNA encoding TALENs to research and design gene-edited cells. (Ex. 5 at 7.)

6.    On information and belief, Defendant CSA is a corporation organized and existing under the laws of the Republic of France, having a principal place of business at 8 rue de la Croix Jarry, 75013 Paris, France.

7.    On information and belief, CI is a wholly owned subsidiary of CSA. CSA collaborates with CI on the use of mRNA TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including various UCART and .HEAL gene-edited cells.

8.    Cellectis is in the business of, among other things, utilizing mRNA TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including, *e.g.*, UCART and .HEAL, throughout the United States, including in the State of Delaware. Cellectis is also in the business of licensing mRNA TALEN technology to other biopharmaceutical companies for use both as a research tool as well as for research to identify and design gene-edited cells.

9.    On information and belief, Defendant AZ Ireland is a private limited company organized and existing under the laws of the Republic of Ireland, having a principal place of business at College Business & Technology Park, Blanchardstown Road North, Dublin 15, Ireland.

10.     AZ Ireland is the direct licensee and payor of royalties to Cellectis pursuant to the Joint Research and Collaboration Agreement between Cellectis and AstraZeneca. *See infra* ¶¶ 110-111.

11.     On information and belief, Defendant AZ Holdings is a private limited company organized and existing under the laws of the Kingdom of the Netherlands, having its registered offices at Prinses Beatrixlaan 582, 2595 BM, The Hague, the Netherlands.

12.     On information and belief, AZ Holdings holds a significant share of Cellectis's outstanding stock. Cellectis has advised investors of potential risks associated with "significant influence over us by the group of companies including AZ Holdings, AZ Ireland and their respective affiliates (referred to as "AstraZeneca" in this Annual Report) and the continuing involvement of certain of our directors with AstraZeneca." Cellectis S.A., SEC Form 20-F for the fiscal year ended December 31, 2024 ("Cellectis Annual Report," excerpts of which are attached hereto as Exhibit 6, at 3.)

13.     On information and belief, Defendant AZ PLC is a public limited company organized and existing under the laws of the United Kingdom, having a registered office and corporate headquarters located at 1 Francis Crick Avenue, Cambridge Biomedical Campus, Cambridge CB2 0AA, United Kingdom.

14.     AZ PLC is the ultimate parent company of AZ Ireland and AZ Holdings, each of which are, directly or indirectly through other members of the AstraZeneca corporate group, wholly-owned subsidiaries of AZ PLC.

15.     On information and belief, AZ PLC and its subsidiaries AZ Ireland and AZ Holdings hold themselves out as being a unitary entity. This entity is, in AstraZeneca's words, "a global, science-led biopharmaceutical company" where AZ PLC directs and controls its

subsidiaries in the identification, research, discovery, manufacture, importation, offering for sale, sale, and distribution of pharmaceutical, biologic, and/or other therapeutic products "in over 100 countries [where] its innovative medicines are used by millions of patients worldwide," including in the United States. *See, e.g.*, https://www.astrazeneca.com/media-centre/press-releases/2024/astrazeneca-completes-cellectis-equity-investment.html (last accessed Sept. 24, 2025). The constituent entities comprising this unitary entity conduct these activities for the benefit of the shareholders of AZ PLC. The AstraZeneca global website presents the company as a single entity and presents the AstraZeneca PLC Board as responsible for setting strategy and policies and monitoring progress toward meeting annual plans of the company, further indicating central control of AstraZeneca PLC over its wholly-owned subsidiaries. *See, e.g.*, https://www.astrazeneca.com/our-company/leadership.html (last accessed Sept. 24, 2025).

16.     On information and belief, the operations of this unitary entity are coordinated via overlapping directorates and senior executives across members of the AstraZeneca group. By way of example, and without limitation, at least seven directors and/or senior executives of AZ Ireland are also directors and/or senior executives of AZ PLC. These shared directors include Pascal Soriot, Chief Executive Officer and Executive Director of AZ PLC; Aradhana Sarin, Chief Financial Officer and Executive Director of AZ PLC; Susan Galbraith, Executive Vice President of Oncology and Haematology Research and Development of AZ PLC; David Frederickson, Executive Vice President of the Oncology and Haematology Business Unit of AZ PLC; Marc Dunoyer, Chief Executive Officer of AstraZeneca's Alexion subsidiary and Chief Strategy Officer for AZ PLC (Mr. Dunoyer is also, pursuant to AstraZeneca's investments in Cellectis, a member of Cellectis's board of directors); Rudd Dobber, Executive Vice President of the BioPharmaceuticals Business Unit of AZ PLC; and Sharon Barr, Executive Vice President of

BioPharmaceuticals Research and Development of AZ PLC. Each of these AZ PLC executives also hold titles as directors and/or senior management positions in AZ Ireland.

17.     On information and belief, the AstraZeneca defendants collaborate on the use of mRNA TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells.

18.     On information and belief, the AstraZeneca defendants, directly or indirectly, including via their respective subsidiaries and/or affiliates, direct and compensate Cellectis pursuant to the AstraZeneca Collaboration Agreement (as defined below) to conduct activities for AstraZeneca's benefit that AstraZeneca knows infringe the Angel Patents, including the use of mRNA TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells.

19.     On information and belief, the AstraZeneca defendants, in collaboration with and induced by Cellectis, intend to continue their infringement of the Angel Patents to develop commercial products that, if made, used, sold, offered for sale or imported into the U.S., would also infringe one or more claims of the Angel Patents.

## JURISDICTION AND VENUE

20.     Each of the preceding paragraphs 1–19 is repeated, re-alleged and incorporated by reference as if fully set forth herein.

21.     This action arises under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq*. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.

22.     This Court has personal jurisdiction over Defendants because each Defendant has established minimum contacts with the forum State of Delaware.

23.     All of the Defendants are subject to personal jurisdiction in Delaware under, at a

minimum, the Delaware Long-Arm Statute, 10 Del. Code § 3104, thereby submitting themselves to the jurisdiction of the Delaware courts because, at a minimum, they have transacted and continue to transact business in the State of Delaware, directly and/or through third parties by making, using, importing, selling and/or offering for sale products and/or services based on infringing mRNA TALEN technology throughout the United States, including in this District. All of the Defendants have therefore purposely availed themselves of the benefits and protections of Delaware's laws such that they should reasonably anticipate being sued in this Court.

24.     This Court has personal jurisdiction over CI because, among other things, CI is a corporation formed under the laws of the State of Delaware.

25.     This Court has personal jurisdiction over CSA pursuant to Federal Rule of Civil Procedure 4(k)(1) and 10 Del. C. § 3104. Alternatively, this Court has personal jurisdiction over CSA because the requirements of Federal Rule of Civil Procedure 4(k)(2)(A) are met since (a) Factor's claims arise under federal law; (b) CSA is a foreign defendant not subject to general personal jurisdiction in the courts of any state; and (c) CSA has sufficient contacts in the United States as a whole such that this Court's exercise of jurisdiction satisfies due process.

26.     On information and belief, CSA directly and/or indirectly through, and/or in concert with CI, makes, uses, imports, sells and/or offers for sale products and/or services based on its infringing mRNA TALEN technology throughout the United States, including in this District. For example, CSA targets its marketing to U.S. customers by way of online websites that are directed to the U.S. and accessible throughout the country, including in this District. These online websites provide corporate contact information for residents in the U.S. who are interested in purchasing Defendants' products and/or services. Accordingly, CSA has sufficient minimum contacts with this District such that the exercise of jurisdiction over CSA will not offend traditional notions of

fair play and substantial justice.

27.    On information and belief, CSA and its subsidiary CI hold themselves out as a unitary entity where CSA directs and controls its subsidiaries in the manufacture, importation, offer for sale, sale, and distribution of gene-editing tools in the United States, including to customers located and/or incorporated in the State of Delaware. For example, CSA's website explains: "Cellectis is one of the few end-to-end gene-editing, allogeneic CAR T cell company [*sic*] that controls its gene and cell therapy process from start to finish. We are capable of moving an innovative new idea from innovation to development, manufacturing, clinical trials, and delivery directly to the patient – all in-house." Cellectis: Manufacturing, CSA, https://www.cellectis.com/en/products/manufacturing/ (last accessed Sept. 24, 2025). Furthermore, in its investor presentations, Cellectis indicates that at least some of these functions, including CAR-T and gene therapy discovery, are provided by CI, a Delaware corporation, at its facilities in New York. (Ex. 5, Cellectis Investor Presentation at 7.)

28.    Moreover, this Court has personal jurisdiction over CSA through principles of agency based upon contacts with the State of Delaware by its agent CI, a subsidiary of CSA that functions as CSA's American office under CSA's direct management and control. Upon information and belief, CSA formed CI to have a presence in the United States, and CI is responsible for the US-wide promotion of CSA products and activities.

29.    Furthermore, personal jurisdiction and venue in this District are proper as to CSA because it has previously consented to jurisdiction and venue in this District by voluntarily appearing as a plaintiff and/or counterclaim plaintiff in prior litigations in the District of Delaware, including the cases captioned as: *Cellectis S.A. v. Precision Biosciences Inc.*, C.A. No. 10-1033-SLR (Nov. 30, 2010); *Cellectis S.A. v. Precision Biosciences Inc.*, C.A. No. 11-173-SLR (Mar. 1,

2011); *Cellectis S.A. v. Precision Biosciences Inc.*, C.A. No. 11-890-SLR (Sept. 30, 2011); *Cellectis S.A. v. Precision Biosciences Inc.*, C.A. No. 12-204-SLR (Feb. 21, 2012); *Cellectis S.A. v. Precision Biosciences Inc.*, C.A. No. 12-1662-SLR (Dec. 5, 2012); and *Precision Biosciences Inc. v. Cellectis S.A, et al.*, C.A. No. 13-247-SLR (Feb. 19, 2013).

30.     Venue in this District is proper as to CI pursuant to 28 U.S.C. § 1400(b) because, as a Delaware corporation, CI resides in this District for venue purposes.

31.     Venue is proper in this District as to CSA pursuant to 28 U.S.C. § 1391(c)(3) because CSA does not reside in any District in the United States.

32.     This Court has personal jurisdiction over AZ PLC pursuant to Federal Rule of Civil Procedure 4(k)(1) and 10 Del. C. § 3104. Alternatively, this Court has personal jurisdiction over AZ PLC because the requirements of Federal Rule of Civil Procedure 4(k)(2)(A) are met since (a) Factor's claims arise under federal law; (b) AZ PLC is a foreign defendant not subject to general personal jurisdiction in the courts of any state; and (c) AZ PLC has sufficient contacts in the United States as a whole such that this Court's exercise of jurisdiction satisfies due process.

33.     On information and belief, AZ PLC directly and/or indirectly through and/or in concert with its affiliates and/or subsidiaries, places pharmaceutical, biologic, and/or other therapeutic products into the stream of commerce throughout the United States, including in this District. For example, AZ PLC targets its marketing to U.S. customers by way of online websites that are directed to the U.S. and accessible throughout the country, including in this District. These online websites provide corporate contact information for residents in the U.S. who are interested in purchasing the AstraZeneca defendants' products. Accordingly, AZ PLC has sufficient minimum contacts with this District such that the exercise of jurisdiction over AZ PLC will not offend traditional notions of fair play and substantial justice.

34.     This Court has personal jurisdiction over AZ Ireland pursuant to Federal Rule of Civil Procedure 4(k)(1) and 10 Del. C. § 3104. Alternatively, this Court has personal jurisdiction over AZ Ireland because the requirements of Federal Rule of Civil Procedure 4(k)(2)(A) are met since (a) Factor's claims arise under federal law; (b) AZ Ireland is a foreign defendant not subject to general personal jurisdiction in the courts of any state; and (c) AZ Ireland has sufficient contacts in the United States as a whole such that this Court's exercise of jurisdiction satisfies due process.

35.     On information and belief, AZ Ireland directly and/or indirectly through and/or in concert with its affiliates and/or subsidiaries, places pharmaceutical, biologic, and/or other therapeutic products into the stream of commerce throughout the United States, including in this District. For example, AZ Ireland targets its marketing to U.S. customers by way of online websites that are directed to the U.S. and accessible throughout the country, including in this District. These online websites provide corporate contact information for residents in the U.S. who are interested in purchasing the AstraZeneca defendants' products. Accordingly, AZ Ireland has sufficient minimum contacts with this District such that the exercise of jurisdiction over AZ Ireland will not offend traditional notions of fair play and substantial justice.

36.     This Court has personal jurisdiction over AZ Holdings pursuant to Federal Rule of Civil Procedure 4(k)(1) and 10 Del. C. § 3104. Alternatively, this Court has personal jurisdiction over AZ Holdings because the requirements of Federal Rule of Civil Procedure 4(k)(2)(A) are met since (a) Factor's claims arise under federal law; (b) AZ Holdings is a foreign defendant not subject to general personal jurisdiction in the courts of any state; and (c) AZ Holdings has sufficient contacts in the United States as a whole such that this Court's exercise of jurisdiction satisfies due process.

37.     On information and belief, AZ Holdings directly and/or indirectly through and/or

in concert with its affiliates and/or subsidiaries, places pharmaceutical, biologic, and/or other therapeutic products into the stream of commerce throughout the United States, including in this District. For example, AZ Holdings targets its marketing to U.S. customers by way of online websites that are directed to the U.S. and accessible throughout the country, including in this District. These online websites provide corporate contact information for residents in the U.S. who are interested in purchasing the AstraZeneca defendants' products. Accordingly, AZ Holdings has sufficient minimum contacts with this District such that the exercise of jurisdiction over AZ Holdings will not offend traditional notions of fair play and substantial justice.

38.     On information and belief, AZ PLC and its subsidiaries AZ Ireland and AZ Holdings hold themselves out as a unitary entity, in AstraZeneca's words, "a global, science-led biopharmaceutical company" where AZ PLC directs and controls its subsidiaries in the identification, research, discovery, manufacture, importation, offering for sale, sale, and distribution of pharmaceutical, biologic, and/or other therapeutic products in the United States, including to customers located and/or incorporated in the State of Delaware. For example, AstraZeneca's website touts that: "AstraZeneca plans to invest $50 billion in America for medicines manufacturing and R&D." https://www.astrazeneca-us.com/media/press-releases/2025/AstraZeneca-plans-to-invest-50-billion-in-America-for-medicines-manufacturing-and-R-and-D.html (last accessed July 22, 2025).

39.     Moreover, this Court has personal jurisdiction over AZ PLC through principles of agency based upon contacts with the State of Delaware by its agents AZ Ireland and/or AZ Holdings, subsidiaries of AZ PLC that take actions within the United States under AZ PLC's direct management and control. *See, e.g.*, AstraZeneca Annual Report and Form 20-F Information 2014 ("2014 Annual Report") at 98, available at

https://www.astrazeneca.com/content/dam/az/Investor_Relations/annual-reports-homepage/2014-Annual-report-English.pdf (last accessed Sept. 22, 2025).

40.     Moreover, this Court has personal jurisdiction over AstraZeneca by virtue of its contacts with this District, including specific contacts with this District that give rise to this civil action. For example, AstraZeneca regularly conducts business in the State of Delaware through its corporate affiliates, including AstraZeneca Pharmaceuticals LP, which is a Delaware corporation with a principal place of business at 1800 Concord Pike, Wilmington, DE 19803. *See* AstraZeneca Annual Report and Form 20-F Information 2020 ("2020 Annual Report") at 236–37, available at https://www.astrazeneca.com/content/dam/az/Investor_Relations/annual-report2020/pdf/AstraZeneca_AR_2020.pdf (last accessed Sept. 21, 2025). Furthermore, upon information and belief, AstraZeneca has purposefully directed conduct towards this District by entering into its license agreement with CI, a Delaware corporation, to commercialize products in the United States, including in this District.

41.     Venue is proper in this District as to AZ PLC pursuant to 28 U.S.C. § 1391(c)(3) because AZ PLC does not reside in any District in the United States.

42.     Venue is proper in this District as to AZ Ireland pursuant to 28 U.S.C. § 1391(c)(3) because AZ Ireland does not reside in any District in the United States.

43.     Venue is proper in this District as to AZ Holdings pursuant to 28 U.S.C. § 1391(c)(3) because AZ Holdings does not reside in any District in the United States.

## **FACTUAL BACKGROUND**

44.     Each of the preceding paragraphs 1–43 is repeated, re-alleged and incorporated by reference as if fully set forth herein.

45.     Since the discovery of the structure of DNA, there has been interest in developing methods to reprogram cells by editing their genetic code to treat disease and improve health. There

are billions of dollars at stake in being the first company to develop such breakthrough treatments, and the present action arises out of the attempt by one company, Cellectis, to jump ahead of the competition by falsely claiming that the patented gene-editing technology painstakingly developed by one of its competitors, Factor, is Cellectis's own proprietary technology to exploit and license as it sees fit.

46.     In the late 2000s and early 2010s, researchers began working with fusion proteins that cleave DNA at specific target sequences. These complexes combined: (1) a protein with a DNA-binding domain that can be programmed to recognize specific DNA sequences, such as a zinc finger array or a type of protein called a transcription activator-like effector ("TALE"); and (2) the catalytic domain of a DNA "nuclease," which is an enzyme capable of cleaving DNA. Researchers hoped that the resulting fusion proteins, called zinc finger nucleases ("ZFNs") or transcription activator-like effector nucleases ("TALENs"), could bind with a target DNA sequence and cleave the target cell's DNA at a precise location, similar to the later-developed and better-known CRISPR technology. These proteins often work in pairs to cleave both strands of the double-stranded DNA molecule. When two ZFN or TALEN monomers (often called a "right arm" and a "left arm") are paired, they can dimerize and create a "double strand" break, cleaving the DNA molecule at the targeted location.

47.     Although in the early 2010s the use of gene editing fusion proteins like ZFNs and TALENs held great potential, there was still one key technical hurdle to overcome: how to efficiently and safely introduce copies of these proteins into the nuclei of living cells so they could perform their DNA-editing functions. While the potential of gene-editing proteins was tantalizing, researchers were hampered by the then-available methods of inducing the target cells to express proteins. These methods involved introducing exogenous DNA, *e.g.* plasmids, into the cells, and

carried risks of uncontrolled mutation that made them unreliable, inefficient, and potentially unsafe for therapeutic use. A method for safely and efficiently inducing cells to express gene-editing proteins was needed.

## Factor's Breakthrough mRNA TALEN Technology

48.     Factor's co-founders, Drs. Matthew Angel and Christopher Rohde, met in 2006 as doctoral candidates working at the Massachusetts Institute of Technology. At MIT, Dr. Angel studied cellular immunology and nucleic acid chemistry, and Dr. Rohde studied cellular reprogramming and regeneration. During his time at MIT, Dr. Angel began working with synthetic mRNA, a type of molecule that, at that time, was very rarely used by researchers due to a lack of efficient methods for synthesizing useful quantities of mRNA of acceptable purity. After receiving their doctorates, Drs. Angel and Rohde founded Factor and began working relentlessly to solve the critical technical problems facing the gene editing field, focusing their efforts on what they recognized as the key technical hurdle preventing the successful development of safe, effective methods for producing gene edited cells: how to deliver the gene-editing proteins into cells efficiently and without causing unwanted mutations.

49.     Using their experience in cell biology and nucleic acid chemistry, and in particular, Dr. Angel's unique experience working with synthetic mRNA, Drs. Angel and Rohde embarked upon a systematic research campaign aimed at solving the gene-editing protein delivery problem, and in the process, Drs. Angel and Rohde developed the first method for gene editing human cells using mRNA. Drs. Angel and Rohde discovered that their pioneering method was exceptionally effective at producing gene edited cells using mRNA encoding TALENs. On information and belief, at that time, no one else in the world was utilizing synthetic mRNA to express TALENs or other proteins for gene editing human cells.

50.     An important outgrowth of their work is the patent rights that protect the technology

that Drs. Angel and Rohde developed through years of painstaking research built upon decades of education and experience. As a result, Factor now has 62 issued United States patents and 22 patent applications currently pending at the United States Patent and Trademark Office ("USPTO"), including the three Angel Patents. Factor's research has also led to interviews and articles in industry publications highlighting the groundbreaking nature of its synthetic-mRNA-based gene-editing technology.

51.     Factor's patents, and the technology that they protect, have been the cornerstone of Factor's efforts to commercialize its groundbreaking technology. Factor itself is conducting in-house development of three allogeneic cell therapy candidates based on techniques related to the mRNA TALEN technology claimed in the Angel Patents. These potentially life-saving treatments include FACT-112, an "iMacrophage" engineered for treatment of solid tumors; FACT-219, allogeneic CAR-T cells engineered to target CD-19 for treatment of large B-cell lymphoma and rheumatology disorders; and FACT-222, allogeneic CAR-T cells engineered to target CD-22 for treatment of acute lymphoblastic leukemia.

52.     In addition to its in-house development work, Factor has also successfully licensed its mRNA TALEN technology to partnering biotechnology companies that are using Factor's technology to develop their own allogeneic cell therapy candidates. The revenue generated from these licenses to the technology protected by the Angel Patents is a vital source of funding for Factor's continued research and development of life-saving therapeutic products.

**The Angel Patents**

53.     Starting in 2011, Factor filed a series of provisional and utility patent applications covering its ground-breaking, novel methods for producing gene-edited cells utilizing synthetic mRNA encoding TALENs.

54.     The first international patent application in this patent family published on June 13,

2013, and the first U.S. application published no later than December 4, 2014. To date, 62 United States utility patents and 10 published pending applications have stemmed from this breakthrough research. Among those issued patents are the three Angel Patents.

## The '410 Patent

55.    On May 26, 2020, the USPTO issued the '410 Patent, entitled "Methods and Products for Transfecting Cells." The named inventors are Matthew Angel and Christopher Rohde, and the assignee is Factor.

56.    The '410 Patent issued from U.S. Patent Application No. 16/776,765, which was filed on January 30, 2020, and claims priority through a series of continuation applications to an earliest provisional application, No. 61/566,948, filed by Factor on December 5, 2011.

57.    The '410 Patent is generally directed to methods of producing gene-edited human cells comprising an inserted DNA sequence, wherein the gene editing is accomplished utilizing synthetic RNA encoding TALENs to produce a double-stranded break in the target cell's DNA, and transfection with a DNA repair template designed to insert the DNA sequence in the region of the double-stranded break.

58.    In 2024, the USPTO reaffirmed the patentability of the '410 Patent after an anonymous third party requested reexamination. A reexamination certificate reflecting certain claim amendments resulting from the reexamination was issued on June 5, 2024. During reexamination, certain dependent claims were cancelled, and the limitations of those dependent claims were added to the independent claims from which the cancelled dependent claims depended. The scope of the claim amendments made during reexamination was insubstantial such that the reissued claims are substantially identical to the originally issued claims. Such insubstantial changes would not alter a person with ordinary skill in the relevant field's understanding of what is being claimed and what is required to infringe those claims versus those

included in the originally issued patent. Certain new dependent claims were also added during reexamination, however, these claims do not expand the scope of the claims from which they depend.

59.    Independent claim 9 of the '410 Patent is representative and recites:

9. A method for producing a plurality of gene-edited cells comprising an inserted DNA sequence, comprising:

(a) providing a plurality of cells comprising a target DNA sequence, wherein the plurality of cells are human cells;

(b) culturing the plurality of cells; and

(c) contacting the plurality of cells with a transfection medium, wherein the transfection medium comprises a plurality of synthetic RNA molecules, wherein the synthetic RNA molecules include:

i. a first synthetic RNA molecule encoding a first fusion protein comprising a DNA-binding domain and a catalytic domain of a nuclease; and

ii. a second synthetic RNA molecule encoding a second fusion protein comprising a DNA-binding domain and a catalytic domain of a nuclease; wherein:

the first fusion protein and the second fusion protein are independently a transcription activator-like effector nuclease (TALEN), resulting in the plurality of cells internalizing the synthetic RNA molecules and expressing the first fusion protein and the second fusion protein to result in a double-stranded break in the target DNA sequence; and

wherein the first synthetic RNA molecule and the second synthetic RNA molecule are independently synthesized by in vitro transcription from a DNA template; and

(d) transfecting the cell with a DNA repair template comprising a sequence for insertion and one or more regions of homology to the DNA of the cell, wherein the one or more regions of homology comprise regions upstream and/or downstream of the double-stranded break, to result in insertion of the sequence in the region of the double-stranded break.

(Exhibit 1, Ex Parte Reexamination Certificate at 2:7-39.)

### The '738 Patent

60.    On November 10, 2020, the USPTO issued the '738 Patent, entitled "Methods and

Products for Transfecting Cells." The named inventors are Matthew Angel and Christopher Rohde, and the assignee is Factor.

61.     The '738 Patent issued from U.S. Patent Application No. 16/857,894, which was filed on April 24, 2020 and claims priority through a series of continuation applications to an earliest provisional application, No. 61/566,948, filed by Factor on December 5, 2011.

62.     The '738 Patent is generally directed to methods of producing gene-edited cells, wherein the gene editing is accomplished utilizing synthetic RNA encoding TALENs to produce a double-stranded break in the target cell's DNA, wherein the synthetic RNA molecules are internalized by the target cells from the medium surrounding the cells.

63.     In 2024, the USPTO reaffirmed the patentability of the '738 Patent after an anonymous third party requested reexamination. A reexamination certificate reflecting certain claim amendments resulting from the reexamination was issued on June 28, 2024. During reexamination, certain dependent claims were cancelled, and the limitations of those dependent claims were added to the independent claims from which the cancelled dependent claims depended. The scope of the claim amendments made during reexamination was insubstantial such that the reissued claims are substantially identical to the originally issued claims. Such insubstantial changes would not alter a person with ordinary skill in the relevant field's understanding of what is being claimed and what is required to infringe those claims versus those included in the originally issued patent. Certain new dependent claims were also added during reexamination, however, these claims do not expand the scope of the claims from which they depend.

64.     Independent claim 1 of the '738 Patent is representative and recites:

1. A method for producing a plurality of gene-edited cells, comprising:

        (a) providing a plurality of cells comprising a target DNA sequence, wherein the

plurality of cells are human cells;

(b) culturing the plurality of cells; and

(c) contacting the plurality of cells with a medium, wherein the medium comprises a plurality of synthetic RNA molecules, wherein the synthetic RNA molecules include:

> i. a first synthetic RNA molecule encoding a first fusion protein comprising a DNA-binding domain and a catalytic domain of a nuclease; and

> ii. a second synthetic RNA molecule encoding a second fusion protein comprising a DNA-binding domain and a catalytic domain of a nuclease;

wherein the first fusion protein and the second fusion protein are independently a transcription activator-like effector nuclease (TALEN); and

wherein the synthetic RNA molecules are added to the medium surrounding the plurality of cells, resulting in the plurality of cells internalizing the synthetic RNA molecules and expressing the first fusion protein and the second fusion protein to result in a double-strand break in the target DNA sequence.

(Exhibit 2, Ex Parte Reexamination Certificate at 1:24-49.)

### The '229 Patent

65.    On April 20, 2021, the USPTO issued the '229 Patent, entitled "Methods and Products for Transfecting Cells." The named inventors are Matthew Angel and Christopher Rohde, and the assignee is Factor.

66.    The '229 Patent issued from U.S. Patent Application No. 16/869,232, which was filed on April 24, 2020 and claims priority through a series of continuation applications to an earliest provisional application, No. 61/566,948, filed by Factor on December 5, 2011.

67.    The '229 Patent is generally directed to *in vitro* or *ex vivo* methods of producing gene-edited cells, wherein the gene editing is accomplished utilizing synthetic RNA encoding TALENs to produce a double-stranded break in the target cell's DNA, wherein the synthetic RNA molecules are internalized by the target cells from the medium surrounding the cells.

68.    In 2024, the USPTO reaffirmed the patentability of the '229 Patent after an

anonymous third party requested reexamination. A reexamination certificate reflecting certain claim amendments resulting from the reexamination was issued on June 21, 2024. During reexamination, certain dependent claims were cancelled, and the limitations of those dependent claims were added to the independent claims from which the cancelled dependent claims depended. The scope of the claim amendments made during reexamination was insubstantial such that the reissued claims are substantially identical to the originally issued claims. Such insubstantial changes would not alter a person with ordinary skill in the relevant field's understanding of what is being claimed and what is required to infringe those claims versus those included in the originally issued patent. Certain new dependent claims were also added during reexamination, however, these claims do not expand the scope of the claims from which they depend.

69.    Independent claim 1 of the '229 Patent is representative and recites:

1. An in vitro or ex vivo method for producing a plurality of gene-edited cells, comprising:

(a) providing a plurality of synthetic RNA molecules, wherein the synthetic RNA molecules include:

i. a first synthetic RNA molecule encoding a first fusion protein comprising a DNA-binding domain and a catalytic domain of a nuclease; and

ii. a second synthetic RNA molecule encoding a second fusion protein comprising a DNA-binding domain and a catalytic domain of a nuclease;

wherein the first fusion protein and the second fusion protein are independently a transcription activator-like effector nuclease (TALEN); and

(b) contacting a plurality of cells in vitro or ex vivo with the plurality of synthetic RNA molecules, the plurality of cells comprising a target DNA sequence, wherein the plurality of cells are a plurality of human cells, wherein the synthetic RNA molecules are added to a medium surrounding the plurality of cells, and

wherein the contacting results in the plurality of cells internalizing the synthetic RNA molecules and expressing the first fusion protein and the second fusion protein resulting in a double-strand break in the target DNA sequence.

(Exhibit 3, Ex Parte Reexamination Certificate at 1:25-49.)

**Infringement by Cellectis**

70.      Cellectis is a French biopharmaceutical company engaged in research regarding gene editing.

71.      In the late 2000s, a group of researchers at the University of Minnesota ("UMN") and Iowa State University ("ISU") isolated the TALE protein from a plant pathogen and realized that its DNA-binding domain could be linked to a nuclease to create a gene-editing protein: the TALEN. These scientists and their respective universities established the 2Blades Foundation to license TALEN technology to researchers in the agricultural field. They also exclusively licensed TALEN technology for research in the human therapeutics field to Cellectis in 2011. On information and belief, however, these researchers used only conventional techniques such as DNA plasmids and viral vectors to induce cells to express TALENs.

72.      Like its licensors from UMN and ISU, but unlike Factor, Cellectis initially used conventional techniques such as DNA plasmids and viral vectors to induce cells to express TALENs. As discussed above, these techniques were less effective, riskier, and less reliable than Factor's mRNA TALEN technology.

73.      In March 2013, Philippe Duchateau, CSO of Cellectis, and Dr. Matthew Angel, CEO of Factor and co-inventor of the Angel Patents, were interviewed for a feature article in Genetic Engineering & Biotechnology News titled "Genome Editing for R&D and Therapeutics" (the "March 2013 Article"). In the March 2013 Article, Dr. Angel described Factor's mRNA TALEN technology claimed in the Angel Patents.  On information and belief, at least Philippe Duchateau and others at Cellectis would have been aware of the contents of the March 2013 Article when it was published.

74.      Shortly after publication of the March 2013 Article, the focus of Cellectis's work

entirely changed. A patent application in the family Cellectis had exclusively licensed from UMN and ISU was amended on May 30, 2013, to include, for the first time in that application or any application related thereto, a claim covering the use of mRNA encoding a TALEN.

75.    Just two weeks later, on June 13, 2013, the international publication of PCT/US2012/067966, WO2013086008A1, the first utility patent application filed in the family of the Angel Patents, published. Following these disclosures of Factor's revolutionary synthetic-mRNA-based TALEN technology, Cellectis reversed course on its own research program, abandoning its plasmid and viral vector-based approaches in favor of Factor's mRNA TALEN technology.

76.    Cellectis's own statements show that its TALEN technology infringes the Angel Patents. Cellectis's website repeatedly touts its use of TALEN technology for "gene editing."



(Ex. 7, Cellectis Homepage at 1.)

77.    Cellectis's investor communications also show that it uses mRNA TALEN technology to edit a plurality of human cells:



(Ex. 8, Cellectis Investor Presentation Aug. 2021 at 24.) "Four days following activation/transduction, ***human T lymphocytes were transfected*** by electrotransfer using an AgilePulse MAX system (Harvard Apparatus). Cells were pelleted and resuspended in cytoporation medium T. $5 \times 10^6$ cells were mixed ***with 5 mg total TRAC TALEN mRNA*** (2.5 mg each of the left and right TALEN arms) into a 0.4 cm cuvette. Separate aliquots of TRAC TALEN or mock transfected cells were again electroporated at different time points (days 2, 7, or 9 post TRAC TALEN transfection) with 20 mg of anti-CD3 CAR mRNA." (Ex. 9, Juillerat 2020 at 2 (emphasis added).)

78.     Cellectis's corporate investor communications further tout the use of TALEN technology to "knockout" unwanted genes and "knockin" chimeric antigen receptors in its UCART "off-the-shelf" allogeneic CAR-T cells.



(Ex. 10, Cellectis Corporate Presentation Sept. 2022 at 6.)

79.     Such "knock-in" CARs are produced utilizing DNA repair templates. For example,

a Cellectis promotional video posted on Cellectis's website describes Cellectis's infringing use of

Factor's patented technology: "The TALENs make a precise cut and this is where the edit will be

made. There are two ways in which genes can be edited, either by knocking out or knocking in . .

. *__a knock-in involves insertion whereby a sequence of external DNA matrix sharing homologies__*

*__with the broken DNA will be copied in at the cut site__*." ("Recipe Video" at 2:23-3:35 (available

at  https://www.cellectis.com/en/media-library/category/video#whats-our-recipe-for-gene-editing

(last accessed Sept. 22, 2025)).)

80.     Another Cellectis online promotional video posted on Cellectis's website confirms

that Cellectis's TALEN process further targets specific DNA sequences: "To produce off-the-shelf

T-cells surface receptors on the cell must be modified. Within the cell, TALEN gene-editing is

used to suppress specific surface receptors on the T-cells, *__a custom TALEN targets and binds to__*

*__precise gene sequences__*. The DNA is clipped by TALEN resulting in the safe inactivation of the

target gene. Through this gene-editing, the targeted receptors are removed from the cell surface,

creating T-cells with CAR proteins ready for use by all patients." ("How Does it Work? Video" at

0:14-0:20   (available   at   https://www.cellectis.com/en/media-library/category/video#cellectis-

gene-edited-car-t-cells-how-does-it-work (last accessed Sept. 22, 2025)).)

81.     Articles published by Cellectis employees show that Cellectis cultures the cells

prior to editing with TALENs: "PBMC cells were thawed, washed, resuspended, and cultivated in X-vivo-15 complete media." (Ex. 11, Sachdeva 2019 at 13.) This article further confirms that Cellectis contacts the cells to be edited with a transfection medium containing synthetic mRNA: "On the day of transduction-***transfection***, the cells were . . . washed twice in Cytoporation buffer T . . ., and resuspended at . . . in the same solution. This cellular suspension was mixed with 5 μg ***mRNA***." (*Id.* at 13 (emphasis added).) Two days after thawing, the cells were washed twice in BTXpress buffer and resuspended at a final concentration of $10 \times 10^6$ cells/mL in the same solution. The cellular suspension ($1 \times 10^6$ cells) was mixed with 15 μg mRNA encoding each TALEN arm in the presence or absence of 4 μg mRNA and 1μg mRNA encoding for HDR-En01 and Via-Enh01, respectively, in a final volume of 100 μl." (Ex. 12, Moiani 2024 at 16.)

82.    Cellectis publications also demonstrate that Cellectis also employs pairs of TALEN "arms" which combine to create double-strand breaks in targeted DNA sequences: "Four days following activation/transduction, human T lymphocytes were transfected by electrotransfer using an AgilePulse MAX system (Harvard Apparatus). Cells were pelleted and resuspended in cytoporation medium T. $5 \times 10^6$ cells were mixed with 5 mg total ***TRAC TALEN mRNA*** (2.5 mg each of the ***left and right TALEN arms***) into a 0.4 cm cuvette. Separate aliquots of TRAC TALEN or mock transfected cells were again electroporated at different time points (days 2, 7, or 9 post TRAC TALEN transfection) with 20 mg of anti-CD3 CAR mRNA." (Ex. 9, Juillerat 2020 at 2 (emphasis added).) "The cellular suspension ($1 \times 10^6$ cells) was mixed with ***15 μg mRNA encoding each TALEN arm*** in the presence or absence of 4 μg mRNA and 1μg mRNA encoding for HDR-En01 and Via-Enh01, respectively, in a final volume of 100 μl." (Ex. 12, Moiani 2024 at 16 (emphasis added).)

83.    Cellectis's website describes the use of TALEN fusion proteins combining the

TALE domains designed to target specific DNA sequences with the catalytic domain of a nuclease: "TALEN® products are designed ***by fusing the DNA cutting domain of a nuclease to TALE domains, which can be tailored to specifically recognize a unique DNA sequence. These fusion proteins serve as readily targetable 'DNA scissors'*** for gene editing applications that enable us to perform targeted genome modifications such as sequence insertion, deletion, repair and replacement in living cells." (Cellectis Webpage at "TAL nucleases, or TALEN®" (available at https://www.cellectis.com/en/research/talen/) (last accessed Sept. 22, 2025)).)

84.     Crucially, other articles published by Cellectis authors subsequent to Cellectis obtaining actual knowledge of the Angel Patents, (*see infra* ¶¶ 129-132), confirm that Cellectis is aware of and uses Factor's synthetic mRNA TALEN technology to express the two TALEN arms within the target cell: Cells are "mixed with ***5 µg mRNA encoding each TRAC TALEN arm*** in the presence or absence of ***5 µg of mRNA encoding each arm of B2M TALEN*** in a final volume of 180 µl." (Ex. 13, Jo 2022 at 13 (emphasis added).) "The cellular suspension ($1 \times 10^6$ cells) was mixed with ***15 µg mRNA encoding each TALEN arm*** in the presence or absence of 4 µg mRNA and 1µg mRNA encoding for HDR-En01 and Via-Enh01, respectively, in a final volume of 100 µl." (Ex. 12, Moiani 2024 at 16 (emphasis added).)

85.     The synthetic mRNA Cellectis uses in these infringing processes is synthesized from DNA templates: "***mRNA was produced*** with EPAP-mediated polyadenylation using the mMessage mMachine T7 Ultra kit (Thermo Fisher Scientific) ***from a PCR product encoding the anti-CD3 CAR*** or without EPAP-mediated polyadenylation or ***from a linearized plasmid DNA template***, encoding the anti-CD3 CAR, a mouse hba 30UTR and a 120-nucleotide-long polyA." (Ex. 9, Juillerat 2020 at 2 (emphasis added).)

86.     Cellectis's promotional videos also state that Cellectis further uses DNA repair

templates to "Knock-in" desired genetic sequences: "[A] ***Knock-In involves insertion whereby a sequence of an external DNA matrix sharing homologies with the broken DNA will be copied in at the cut site***." (Recipe Video at 2:57-3:17.)

87.    Cellectis publications further confirm that Cellectis transfects cells with synthetic mRNA encoding TALENs by adding such synthetic mRNA molecules to the medium surrounding the target cells where such mRNA molecules contact the target cells, resulting in the target cells internalizing the synthetic mRNA molecules: "A total of 5 million [target cells] ***were transfected in each transfection with a total of 2.5 µg for each arm of TALEN mRNA*** …. ***For transfection, cells were concentrated … in Cytoportation buffer T*** …." (Ex. 14, Aranda-Orgilles 2023 at 947.)

88.    Cellectis itself has used this infringing synthetic mRNA TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including various "off the shelf" "universal CAR T-Cells," such as UCART22, targeting the CD22 receptors for researching treatments of acute lymphoblastic leukemia, and UCART20x22, targeting the CD20 and CD22 receptors for researching treatments of non-Hodgkins lymphoma.

89.    Additionally, Cellectis infringes Factor's synthetic mRNA TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including those used for its .HEAL "gene therapy platform," which utilizes mRNA TALEN technology for *in vivo* editing to correct single gene genetic disorders. The first potential .HEAL therapy, TALGlobin, is a process for gene editing bone marrow cells for treatment of Sickle Cell Disease.

90.    According to Cellectis's investor presentations, the infringing activities discussed above are carried out by CI in its New York, NY offices. (Ex. 5, at 7 (listing New York as Cellectis's center for "Gene editing platform – TALEN®," "CAR T discovery," and "*In vivo* gene therapy discovery").) Cellectis's annual report filed with the SEC similarly states that its "24,375

square feet facility in New York, New York" is used for "research and development activities," which include the infringing methods. (Ex. 6, Cellectis Annual Report at 77.)

91.     Cellectis's promotional videos further confirm that Cellectis's "research team here in New York is developing next-generation product based on cutting edge gene editing technologies and breakthrough cell therapy innovations." (Cellectis 2020 Shareholders Video at 1:33-1:43 (available at: https://www.cellectis.com/en/media-library/category/video#cellectis-2020-shareholders-video (last accessed Sept. 22, 2025)).) According to another promotional video, Cellectis's New York facility conducts the research needed to take a "lead TALEN candidate to next generation UCART prototypes" in the New York lab where "we assemble the TALEN, we produce them here in New York. We use next generation sequencing which we have here in-house that we use to test the TALEN from start to finish from activity through specificity to, in the end, pick the best one and then from that we generate a large quantity of RNA to then pass on to the next person for future tests in whatever experiments they're doing . . . . [W]e use an electroporator to incorporate the TALEN into the cells and once we bring it in, the TALEN will express and we'll be able to modify the genome and generate the modifications that we want . . . and then when we know that from a small number of cells after we modify them we are able to get a large number of cells is when we have our prototype and we are ready to send it to the next level." ("Cellectis Innovation Days – Episode 3" at 3:45-6:19 (available at https://www.youtube.com/watch?v=bZyUDbW9Pjc (last accessed Aug. 28, 2025).)

92.     Cellectis further confirmed that, after this initial research is conducted in New York, scale up activities begin in France for clinical development: "Along the life cycle of the product, the development work comes in between the innovation and the final clinical manufacturing. Our mission, together with the analytical development group, is to start from the

proof of concept that has been made in New York, delivering us the TALEN and the CAR construct to put in place a robust manufacturing process to allow the production of UCART T cells. So really, the main mission of our group [in Paris] is to upscale robust methods, efficient methods, that are also suitable for clinical manufacturing." (Cellectis Innovation Days – Episode 3 at 6:46-7:30.)

93.     According to Cellectis's investor presentations, additional infringing activities are carried out by CSA, namely importation of "[s]tarting materials," including "mRNA," into the United States where they are used by CI and/or Cellectis's United States based partners pursuant to the agreements discussed above as a material component of the infringing methods both as a research tool as well as for research to identify and design gene-edited cells via synthetic-mRNA-based TALEN gene editing. (*Id.*) Cellectis's annual report filed with the SEC confirms that CSA's Paris facilities are "dedicated to the production of certain raw and starting material" and conduct of unspecified "research and development activities." (Ex. 6, Cellectis Annual Report at 76.) Cellectis's synthetic mRNA "starting materials" are specifically designed for use in the infringing methods and are not staple articles of commerce capable of substantial non-infringing uses.

94.     On information and belief, Cellectis also infringes the Angel Patents by offering for sale its infringing methods of synthetic-mRNA-based TALEN gene editing to customers in the United States. Cellectis actively solicits customers and offers these methods for sale via its United States website. (*See, e.g.*, Cellectis "Contact" page (offering "Partner or Business Development Inquiry" as a "service" to U.S. customers) (available at https://www.cellectis.com/en/contact/ (last accessed Sept. 22, 2025)).) On information and belief, Cellectis also offers for sale its infringing methods of synthetic-mRNA-based TALEN gene editing to customers at industry and academic conferences in the United States, including the annual J.P. Morgan Healthcare Conference and the

annual meetings of the American Society of Hematology and the American Association for Cancer Research.

95.     None of the TALENs themselves, the synthetic mRNA encoding them, or DNA repair templates used in conjunction with them are drug products or biological products as those terms are defined in statute or FDA regulations, and none of these research tools are subject to FDA pre-market regulatory approval under the Food Drug & Cosmetics Act.

96.     Similarly, the product of the patented process for producing a "plurality of gene-edited cells" is also not, itself, an FDA-approvable product subject to FDA pre-market regulatory approval under the Food Drug & Cosmetics Act. Instead, once Cellectis has transfected a plurality of human cells with mRNA encoding TALENs in its research, the product is a heterogeneous mixture of gene-edited and non-gene-edited cells, which is not an approvable product and is only a step in the research and identification of gene-edited cells that could possibly have properties that would make them candidates for FDA approval as a therapeutic agent. As Cellectis's own website makes clear, production of gene-edited cells using the infringing mRNA-based TALEN technology is only one step in the process of producing the final, FDA-approvable product:



**Step 4: TALEN-Mediated Gene Editing**

Our proprietary Pulse Agile electroporation technology uses precise electrical pulses to create temporary pores in the CAR T-cells that make them permeable. This allows us to introduce the TALEN® (transcription activator-like effector nucleases), which are enzymes that have been engineered to cut specific sequences of DNA. As an example, a precise edit is made that eliminates the T-cell receptor (TCR). This is an important step since the TCR would normally trigger a rejection response from the patient's immune system since the cells come from donors. Knock-outs of more than one gene are possible with our technologies.

(Cellectis Website, Manufacturing (available at

https://www.cellectis.com/en/products/manufacturing/ (last accessed Sept. 22, 2025).)

97.     Cellectis's use of Factor's patented mRNA-based TALEN gene editing process thus constitutes both basic research and the use of a research tool, neither of which is protected by the safe harbor provision of 35 U.S.C. § 271(e)(1).

98.     Instead, to date, at least some of Cellectis's activities have included the use of the infringing methods both as a research tool as well as being directed to research to identify and design gene-edited cells and entering licenses with the broader industry as described below. The use of Factor's technology in this manner is not "solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products."

99.     As such, Cellectis's use of the patented methods both as a research tool as well as for research to identify and design gene-edited cell lines is not protected by the so-called "Safe Harbor" provision of 35 U.S.C. § 271(e)(1).

### Cellectis's Activities Have Harmed Factor

100.    Beginning in the year after learning the details of Factor's proprietary mRNA TALEN technology, Cellectis launched an aggressive campaign to capitalize on the technology it copied from Factor.

101.    In 2014, Cellectis and Les Laboratoires Servier ("Servier") entered into an agreement whereby Servier would use Factor's mRNA TALEN technology, passed off as Cellectis's own, both as a research tool as well as for research to identify and design gene-edited cells, including six TALEN-engineered CAR-T cells for potential cancer treatment. The Servier-Cellectis agreement was amended in 2020.

102.    Under the publicly disclosed terms of the Servier agreement, Servier paid Cellectis an upfront fee of $10 million, and an additional €25 million lump sum payment as consideration for the execution of the 2020 amendment. The license further included up to $410 million in milestone payments, and sales of products identified, researched, and designed using Factor's mRNA TALEN technology will carry royalties ranging from tiered high single-digit rates to flat low double-digit royalty rates based on the amount of net sales of such products. (Ex. 6, Cellectis Annual Report at 52.)

103.    In June 2014, Cellectis and Pfizer, Inc. ("Pfizer") entered into a Research Collaboration and License Agreement whereby Pfizer would use Factor's mRNA TALEN technology, passed off as Cellectis's own, both as a research tool as well as for research to identify and design gene-edited cells, including CAR-T cells for cancer treatment.

104.    Pursuant to the Pfizer Collaboration and License Agreement, Pfizer paid Cellectis an up-front payment of $80 million, and the license further included up to $3.25 billion in milestone payments.

105.    On March 8, 2019, Cellectis and Allogene entered into a new license agreement

pursuant to which Allogene would use Factor's mRNA TALEN technology, passed off as Cellectis's own, both as a research tool as well as for research to identify and design gene-edited cells, including 17 gene-edited CAR-T cells for cancer treatment.

106.    The Allogene License Agreement included an undisclosed upfront payment, as well as milestone payments totaling up to $2.8 billion dollars ($185 million per target). Sales of any products commercialized under the Allogene License Agreement will reportedly be subject to tiered royalty payments to Cellectis "at rates in the high single-digit percentages." (Ex. 6, Cellectis Annual Report at 52.)

107.    On December 30, 2019, Cellectis and Iovance entered into a research collaboration and exclusive worldwide license agreement pursuant to which Iovance would use Factor's mRNA TALEN technology, passed off as Cellectis's own, both as a research tool as well as for research to identify and design gene-edited cells, including 17 gene-edited tumor infiltrating lymphocytes for cancer treatment.

108.    The terms of the Iovance agreement are not publicly available at this time, although Cellectis has disclosed to investors that "[f]inancial terms of this license include development, regulatory and sales milestone payments to us, as well as royalty payments based on net sales…." (Ex. 6, Cellectis Annual Report at 53.)

109.    As discussed above, the technology that Cellectis licensed to these companies, and that these companies paid Cellectis millions of dollars for access to, is Factor's patented mRNA TALEN technology. The net effect of this licensing campaign was to establish a reputation in the industry for Cellectis as "the TALEN company" in the marketplace on the back of Factor's breakthroughs. By using Factor's revolutionary synthetic-mRNA-based TALEN gene-editing technology, Cellectis has been able to leverage the news of blockbuster deals like the agreement

with Pfizer to grow its market share and freeze out Factor from those same potential customers.

**Infringement by AstraZeneca**

110.    On November 1, 2023, Cellectis and AstraZeneca entered into a Joint Research and Collaboration Agreement (the "AstraZeneca Collaboration Agreement") whereby AstraZeneca and/or Cellectis would use Factor's mRNA TALEN technology, passed off by Cellectis as its own, both as a research tool as well as for research to identify and design gene-edited cells, including 10 gene-edited CAR-T cells. A redacted copy of the AstraZeneca Collaboration Agreement filed by CSA with the United States Securities and Exchange Commission ("SEC") is attached hereto as Exhibit 15.

111.    The AstraZeneca Collaboration Agreement included an upfront payment of $25 million, as well as a provision whereby AstraZeneca would reimburse Cellectis for research costs associated with the use of the infringing methods both as a research tool as well as for research to identify and design gene-edited cells, including CAR-T cells. The agreement further provides for milestone payments totaling up to $2.2 billion dollars ($220 million per target), as well as "royalties, which may range from mid-single to low-double digits, based on the sale of Licensed Products." (Ex. 6, Cellectis Annual Report at 53.)

112.    Concurrent with the execution of the AstraZeneca Collaboration Agreement, Cellectis and AstraZeneca also entered into an Initial Investment Agreement whereby AstraZeneca paid $80 million in return for approximately 22% of share capital in Cellectis. Subsequently, on November 7, 2023, Cellectis and AstraZeneca entered into a Subsequent Investment Agreement ("SIA"), which completed in May 2024 following regulatory review by the French Ministry of Economy, resulting in another $140 million investment by AstraZeneca in return for newly created preferred shares in Cellectis, which may be converted into ordinary shares under certain conditions. (*Id.* at 53-54.) Redacted versions of the Initial Investment Agreement and a

Memorandum of Understanding attaching the form of the SIA filed by CSA with the SEC are attached hereto as Exhibits 16 and 17, respectively.

113.    The net result of these investments is that, as of December 31, 2024, AstraZeneca controls approximately 30% of the voting rights in Cellectis, which may rise to approximately 44% if all conversion rights are exercised. (Ex. 6, Cellectis Annual Report at 54.)

114.    Additionally, pursuant to the SIA, on December 22, 2023, two AstraZeneca designees were elected to serve on the board of Cellectis. (*Id.*)

115.    Pursuant to the AstraZeneca Collaboration Agreement, AstraZeneca has announced investigative activities are underway using the infringing mRNA TALEN technology licensed from Cellectis both as a research tool as well as for research to identify and design gene-edited cells, including two allogeneic CAR-T cells aimed to target "hematological malignancies" and "solid tumors," respectively. Additionally, AstraZeneca has announced initial research relating to its own *in vivo* gene-editing products aimed to target unspecified genetic disorders utilizing the infringing mRNA TALEN technology licensed from Cellectis under the AstraZeneca Collaboration Agreement. (Ex. 5, Cellectis Investor Presentation at 8.)

116.    On information and belief, this activity is being performed by Cellectis for the benefit of and at the direction of AstraZeneca. The AstraZeneca Collaboration Agreement is structured for AstraZeneca to reimburse Cellectis for research costs and contains detailed provisions for governance of research, which includes provisions permitting AstraZeneca to exercise an "AstraZeneca Step-In Right" on a "Research Plan-by-Research-Plan basis" if Cellectis fails to complete "the applicable Cellectis Research Activities." (Ex. 15, Redacted Public Version of AstraZeneca Collaboration Agreement at 23.)

117.    Given the Defendants' respective positions, on information and belief, the

"Cellectis Research Activities" contemplated under the AstraZeneca Collaboration Agreement include use of the infringing synthetic-mRNA-based TALEN gene-editing technology to identify and design gene-edited cells for AstraZeneca.

118.    According to Cellectis's investor presentations, such infringing activities are carried out by CI in its New York, NY offices. (Ex. 5, at 7 (listing New York as Cellectis's center for "Gene editing platform – TALEN®," "CAR T discovery," and "*In vivo* gene therapy discovery").) Cellectis's annual report filed with the SEC similarly states that its "24,375 square feet facility in New York, New York" is used for "research and development activities," which include the infringing methods. (Ex. 6, Cellectis Annual Report at 77.) Cellectis's promotional videos further confirm that Cellectis's "research team here in New York is developing next-generation product based on cutting edge gene editing technologies and breakthrough cell therapy innovations." (Cellectis 2020 Shareholders Video at 1:33-1:43.) On information and belief, such "research" regarding possible "next-generation product" in New York includes Cellectis's use of the infringing methods both as a research tool as well as for research to identify and design gene-edited cells for AstraZeneca.

119.    According to Cellectis's investor presentations, additional infringing activities are carried out by CSA, namely importation of "[s]tarting materials" including "mRNA" into the United States where it is used by CI and/or Cellectis's United States based partners pursuant to the agreements discussed above as a material component of the infringing methods both as a research tool as well as for research to identify and design gene-edited cells via synthetic-mRNA-based TALEN gene editing. (*Id.*) Such synthetic mRNA "starting materials" are specifically designed for use in the infringing methods and are not staple articles of commerce capable of substantial non-infringing uses.

120.    Given that only three non-specific indications (*e.g.*, "hematological malignancies," "solid tumors," and an unspecified "genetic disorder") of the ten potential products contemplated by the AstraZeneca Collaboration Agreement have been announced to date, on information and belief, Cellectis's and AstraZeneca's infringement of the Angel Patents will continue into the future.

121.    To date Cellectis's and AstraZeneca's infringing activities include use of the infringing methods both as a research tool as well as for research to identify and design gene-edited cells. Under the express terms of the AstraZeneca Collaboration Agreement, Cellectis and AstraZeneca agreed to a governance structure whereby AstraZeneca provides "written notice to Cellectis that it desires to enter into a research plan that will govern the identification and Development of product(s) directed to Collaboration Target(s) [defined as, *inter alia*, a specific protein, RNA, chimeric antigen receptor, or T cell receptor antigen – a 'Collaboration Target' is not, itself, a product]" and based on that notice, Cellectis and AstraZeneca, through a Joint Steering Committee established under the agreement, will develop a detailed "Research Plan" including a "Research Budget" and "the specific criteria to assist AstraZeneca in determining which Candidate Product to progress into clinical Development" based on agreed "Development Candidate Criteria," and this Research Plan must also include "any research milestone(s) to be achieved by Cellectis prior to selection of a Development Candidate by AstraZeneca." (Ex. 15, AstraZeneca Collaboration Agreement § 2.3.1-2.3.2.) In other words, the AstraZeneca Collaboration Agreement contemplates a two-stage process with a bright-line gating threshold between research activities and clinical development activities.

122.    On information and belief, Cellectis's and AstraZeneca's infringing activities are still in the early research stage. Nearly two years after signing the AstraZeneca Collaboration

Agreement, Cellectis's and AstraZeneca's activities are still at such an early stage of basic research that none of the potential gene-edited cells appear on AstraZeneca's pipeline website (the only gene therapies listed are CRISPR-based), and the listing for the three potential indications on Cellectis's pipeline page are little more than placeholders – there are not any development codes listed, or even specific targeted indications, just broad categories (*e.g.*, "hematological malignancies," "solid tumors," and an unspecified "genetic disorder"). There have been no scientific publications published by either Cellectis or AstraZeneca reporting results of any of this basic research. Indeed, on a March 2025 earnings call to investors, Cellectis reported that it is "keeping [its research for AstraZeneca] under wraps for now" pending development of a "comprehensive data set" or "proof-of-concept" for any of these possible gene-edited cells. (*See* Ex. 18, Cellectis Q4 2024 Earnings Call Transcript at 9.) The use of Factor's technology to conduct basic research to identify possible leads for further investigation is not "solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products."

123.    On information and belief, none of the activities carried out by AstraZeneca and/or Cellectis pursuant to the AstraZeneca Collaboration Agreement to date have included any clinical testing of any gene-edited cells. Rather, all such activities to date have focused on target identification, in which the methods licensed and/or carried out by Cellectis pursuant to the AstraZeneca Collaboration Agreement have been used as research tools to identify potential cells for further investigation.

124.    None of the TALENs themselves, the synthetic mRNA encoding them, or DNA repair templates used in conjunction with them are drug products or biological products as those terms are defined in statute or FDA regulations, and none of these research tools are subject to

FDA pre-market regulatory approval under the Food Drug & Cosmetics Act.

125.    Similarly, the product of the patented process for producing a "plurality of gene-edited cells" is also not, itself, an FDA-approvable product subject to FDA pre-market regulatory approval under the Food Drug & Cosmetics Act. Instead, once Cellectis and/or AstraZeneca has transfected a plurality of human cells with mRNA encoding TALENs in such research, the product is a heterogeneous mixture of gene-edited and non-gene-edited cells, which is not an approvable product and is only a step in the research and identification of gene-edited cells that could possibly have properties that would make them candidates for FDA approval as a therapeutic agent. As discussed above, Cellectis's own website makes clear, production of gene-edited cells using the infringing mRNA-based TALEN technology is only one step in the process of producing the final, FDA-approvable product. *See supra* ¶ 96.

126.    Likewise, as Cellectis's scientific presentations illustrate, in its .HEAL therapy for treatment of Sickle Cell Disease, the editing of hematopoietic stem cells ("HSPCs") using the infringing mRNA-based TALEN technology to delete the sickle cell gene is only one step in a multi-day process of producing a cell suspension that could possibly be FDA approvable (although there is no indication that Cellectis has filed any application for such approval). On information and belief, in any *in vivo* gene therapy developed by Cellectis and AstraZeneca production of a plurality of gene edited cells would similarly be an early step in a multi-stage process of producing an approvable product.



Representative schema of TALEN-mediated editing protocol using an mRNA encoding TALEN targeting the B2M locus and lssDNA or cssDNA as DNA donor templates to insert a tag (0.6 kb) or a reported gene (2.2 kb) via non-disruptive and disruptive insertions, respectively. mRNAs encoding a viability enhancer and a HDR enhancer (Via-Enh01 and HDR-Enh01, respectively) were also incorporated in the process. The timing is indicated in days (D0-D7). Edited cells obtained 7 days post thawing were characterized by flow cytometry to assess the level of knock-in (KI) of DNA donor templates and knock-out (KO) of B2M as well as their viability. The differentiation capacity of HSPCs into erythroid and myeloid progenitors was also assessed by colony forming unit (CFU) assay.

(Ex. 19, Letort 2025 Poster.)

127.    Defendants' use of Factor's patented mRNA-based TALEN gene-editing process thus constitutes both basic research and the use of a research tool, neither of with is protected by the safe harbor provision of 35 U.S.C. § 271(e)(1).

128.    For at least the foregoing reasons, AstraZeneca's and/or Cellectis's use of the methods covered by the AstraZeneca Collaboration Agreement both as a research tool as well as for research to identify and design gene-edited cell lines is not protected by the so-called "Safe Harbor" provision of 35 U.S.C. § 271(e)(1).

## Cellectis's Knowledge of the Angel Patents

129.    As discussed above, Cellectis learned details of the synthetic mRNA TALEN technology claimed in Factor's then pending, but not yet published, patent applications at least as early as the March 2013 Article, through which at least Cellectis's CSO, Mr. Duchateau, learned details of Factor's mRNA TALEN technology. *See supra* ¶ 73.

130.    In addition to the March 2013 Article, Cellectis has had specific knowledge of the patent family of the Angel Patents since at least on or about October 19, 2017. On that date, Frank Borriello, a business development consultant of Factor's affiliate and licensee, Novellus, Inc.

("Novellus"), emailed Julia Berretta, VP Business Development and Strategic Planning of Cellectis, to introduce Novellus. Mr. Borriello attached Novellus's intellectual property ("IP") deck to his email, which included Factor patents in-licensed by Novellus from Factor, including patents in the same family as the Angel Patents. Ms. Berretta replied and requested a call. The call was held at 10:30am on Monday, October 30, 2017, and included Dr. Angel, Mr. Duchateau, and Laurent Poirot, SVP Immunology of Cellectis. Dr. Angel reviewed Factor's patents on the call. Mr. Borriello and Ms. Berretta scheduled an in-person meeting during the JP Morgan Healthcare Conference in January 2018.

131.    In addition to knowledge of the family of the Angel Patents, Cellectis has had actual knowledge of the Angel Patents since at least June 2022. On June 15, 2022, Dr. Angel met with Arthur Stril, CBO of Cellectis, at the BIO conference in San Diego, where the two discussed Factor's mRNA TALEN patents. Dr. Angel opened a physical copy of Factor's Technology Catalog in front of Mr. Stril to the page that described Factor's mRNA TALEN technology and pointed to Representative Claim 1 of the '410 Patent, thus providing actual knowledge of all of the claims of the '410 Patent (and, because they are of substantially identical scope, all the claims of the reexamined '410 Patent). Dr. Angel gave Mr. Stril the Technology Catalog to take with him. A copy of this edition of Factor's Technology Catalog is attached hereto as Exhibit 4.

132.    Further, Cellectis had actual knowledge of the '410 and '738 Patents at least as of March 11, 2021, when they were listed in an Information Disclosure Statement ("IDS") during prosecution of Cellectis's U.S. Patent Application Number 17/198,505 ("the '505 application"). Following this disclosure, the then-pending claims of the '505 application were rejected as anticipated by claims of both the '410 and '738 Patents in an office action issued on June 28, 2021. On July 7, 2021, Cellectis and the examiner held a telephone interview expressly discussing the

'410 and '738 Patents and amendments to overcome the anticipation rejections over each of them, including by limiting the claims to "human primary T cells." Following this interview, on July 13, 2021, Cellectis filed the amendments discussed, demonstrating that not only was Cellectis aware of the '410 and '738 Patents, but also that Cellectis knew that such patents would be infringed by Cellectis's methods as reflected in its pre-amendment claims. (Ex. 20, Excerpts of the Prosecution History of U.S. Pat. App. No. 17/198,505)

133.    On information and belief, given the foundational nature of the claimed technology and the broad scope of the claims of the Angel Patents, Cellectis had actual knowledge that its use of synthetic mRNA to express TALENs for gene editing would infringe at least claims 1 and/or 9 of the '410 Patent. The only way to avoid such actual knowledge would have required taking deliberate steps to remain willfully blind to this infringement.

134.    In 2024, the USPTO reaffirmed the patentability of the Angel Patents after an anonymous third party requested reexamination. Although the claims were amended during reexamination, the amendments to the claims—primarily involving cancelling certain dependent claims and incorporating those limitations into the independent claims from which the cancelled claims depended (and addition of a few new dependent claims that by law could not expand the scope of the claims)—did not materially alter the scope of the claims such that the reexamined claims are substantially identical to the originally issued claims. Such substantially identical claims would not have altered Cellectis's understanding that Cellectis's activities infringe the reexamined claims as well as the claims of the originally issued patents. Furthermore, on information and belief, upon becoming aware of the existence of Factor's patents, Cellectis monitored Factor's patents and pending applications, including the results of the reexaminations, as any sophisticated competitor would have done.

## AstraZeneca's Knowledge of the Angel Patents

135.    AstraZeneca also has had actual knowledge of the family of the Angel Patents since at least June 2019. In early June 2019, John Westman, a member of the business development team of Factor's then-affiliate and licensee, Novellus, met with Christopher Church, Manager, Partnering and Strategy, BioPharmaceuticals R&D of AstraZeneca. On June 8, 2019, Mr. Westman followed up with Mr. Church via email and attached a slide presentation describing Factor's patents, including members of the family of the Angel Patents. On July 15, 2019, Mr. Westman emailed Mr. Church to follow up. Mr. Church responded on July 16, 2019, saying "I did share your slides and approach with our discovery sciences and gene editing group, but I've not had any feedback so far." (Ex. 21, Email chain between Church and Westman.)

136.    Additionally, AstraZeneca has had actual knowledge of the Angel Patents since at least October 2020. On October 15, 2020, Factor sent (via individual FedEx Express mailings) a copy of Factor's Technology Catalog, which includes Representative Claim 1 of the '410 Patent, to eight AstraZeneca employees, including AstraZeneca's CEO, Pascal Soriot, its Senior Patent Counsel, Scott Williams, and other AstraZeneca patent directors and patent attorneys. Factor received confirmation from FedEx that these copies of Factor's Technology Catalog were signed for and received by AstraZeneca. On December 1, 2020, Factor once again sent (via individual FedEx Express mailings) a copy of Factor's Technology Catalog, which includes Representative Claim 1 of the '410 Patent, to 24 additional AstraZeneca employees with responsibilities related to AstraZeneca's legal and patent operations. Factor was notified by FedEx that, unlike the initial mailings in October 2020, AstraZeneca refused to accept delivery of these copies of Factor's Technology Catalog, which were returned to Factor. On information and belief, this indicates that AstraZeneca's patent counsel had knowledge of the contents of the earlier copies sent in October, including Representative Claim 1 of the '410 Patent, and undertook deliberate actions to avoid that

knowledge being further disseminated within the organization. A copy of this edition of Factor's Technology Catalog is attached hereto as Exhibit 22, and a copy of the cover letter that accompanied the copy sent to Mr. Soriot, which is the same (other than addressee information) as the cover letter accompanying each copy sent to AstraZeneca, is attached hereto as Exhibit 23. Provision of the full text of Representative Claim 1 of the '410 Patent to AstraZeneca patent and legal personnel provided AstraZeneca with actual knowledge of all of the claims of the '410 Patent (and, because they are of substantially identical scope, all the claims of the reexamined '410 Patent).

137.    Further, on information and belief, AstraZeneca conducted diligence prior to entering into its multi-million-dollar Collaboration Agreement with Cellectis.

138.    Such diligence is standard practice in the industry and would include investigation of both the landscape of patents in effect covering the subject matter of the collaboration and the infringement of those patents that may occur as a result of the collaboration. On information and belief, given the foundational nature of the claimed technology and the broad scope of the claims of the Angel Patents, AstraZeneca learned about the Angel Patents prior to finalizing its Collaboration Agreement with Cellectis.  A sophisticated, multinational pharmaceutical giant such as AstraZeneca could not conduct proper diligence into a Collaboration Agreement with a biotech company like Cellectis and not realize that the gene-editing process it was paying Cellectis to employ in identifying and designing gene-edited cells for AstraZeneca, utilizing synthetic mRNA to express TALENs for gene editing, infringes at least claims 1 and/or 9 of the '410 Patent. By virtue of such pre-agreement diligence and its actual knowledge of the Angel Patents discussed above, AstraZeneca had actual knowledge that Cellectis's process for gene editing cells infringes the Angel Patents.

139.    Such knowledge may also be inferred from the very limited number of companies capable of producing gene-edited cells for research into potential therapeutic applications. On information and belief, there are less than a handful of such companies in the world. Any sophisticated pharmaceutical company seeking to engage one of these companies would have evaluated the technology of each of the potential partner's competitors, including reviewing their respective patent estates, during diligence of any such transaction.

140.    If AstraZeneca lacked actual knowledge of the Angel Patents, AstraZeneca must have taken deliberate actions to avoid the diligence that would have inevitably led to such knowledge and was therefore willfully blind to the Angel Patents and Cellectis's infringement.

141.    In 2024, the USPTO reaffirmed the patentability of the Angel Patents after an anonymous third party requested reexamination. Although the claims were amended during the reexamination, the amendments to the claims—primarily involving cancelling certain dependent claims and incorporating those limitations into the independent claims from which the cancelled claims depended (and addition of a few new dependent claims that by law could not expand the scope of the claims)—did not materially alter the scope of the claims such that the reexamined claims are substantially identical to the originally issued claims. Such substantially identical claims would not have altered AstraZeneca's understanding that Cellectis's and AstraZeneca's activities infringe the reexamined claims as well as the claims of the originally issued patents. Furthermore, on information and belief, upon becoming aware of the existence of Factor's patents, AstraZeneca monitored Factor's patents and pending applications, including the results of the reexaminations, as any sophisticated competitor would have done.

## CLAIM 1
### (Direct Infringement of the '410 Patent by Cellectis)

142.    Each of the preceding paragraphs 1–141 is repeated, re-alleged and incorporated by

reference as if fully set forth herein.

143.    On information and belief, Cellectis has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of Factor's '410 Patent, pursuant to 35 U.S.C. § 271(a), by making, using, selling, or offering to sell within the United States or importing into the United States gene-edited cells, *e.g.*, Cellectis's UCART cells and cells for use in .HEAL products as well as AstraZeneca's announced allogeneic CAR-T cells, and/or AstraZeneca's announced potential gene-editing products without authority from Factor. Cellectis has also infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of Factor's '410 Patent, pursuant to 35 U.S.C. § 271(a), by using Factor's patented synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based gene-editing products by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

144.    Cellectis's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '410 Patent.

145.    Cellectis's infringement has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from Cellectis's wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

146.    As a result of Cellectis's ongoing infringement, Factor has been and will continue to be irreparably harmed. Unless Cellectis is enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 2
### (Indirect Infringement of the '410 Patent by Cellectis)

147.    Each of the preceding paragraphs 1–146 is repeated, re-alleged and incorporated by

reference as if fully set forth herein.

148.    On information and belief, Cellectis has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of the '410 Patent, pursuant to 35 U.S.C. § 271(b) and/or (c).

149.    Pursuant to its various agreements, Cellectis has and will continue to cause its contractual partners including, without limitation, AstraZeneca, to use Cellectis's infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based gene-editing products, by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

150.    Cellectis intends that its contractual partners including, without limitation, AstraZeneca, will use such infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based gene-editing products, and does so with the knowledge and specific intent to induce such direct infringement by its contractual partners, including without limitation, AstraZeneca.

151.    Pursuant to its various agreements, Cellectis has and will continue to supply its contractual partners including, without limitation, AstraZeneca, with materials, including without limitation, synthetic mRNA encoding TALENs, that constitute material components of the infringing methods of utilizing such synthetic mRNA encoding TALENs to produce gene-edited cells. Additionally, CSA has and will continue to import such materials into the United States for use as material components of the infringing methods of utilizing such synthetic mRNA encoding TALENs to produce gene-edited cells by CI in connection with CI's use of the infringing methods

both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based gene-editing products at its New York, NY facilities.

152.    Pursuant to its various agreements, Cellectis supplies such materials to CI and Cellectis's contractual partners including, without limitation, AstraZeneca, knowing that such materials are specifically made and adapted for uses by such contractual partners that directly infringe Factor's claimed methods. Such materials are not staple articles of commerce suitable for substantial non-infringing uses, but rather are highly specialized tools engineered at a genetic level to do one thing – to cause target cells to express TALENs for the purpose of editing the genes of the target cells in a manner that directly infringes the claims of the '410 Patent.

153.    Cellectis specifically intends that CI and Cellectis's contractual partners including, without limitation, AstraZeneca, will use such materials as material components of methods that employ Cellectis's infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based gene-editing products.

154.    Cellectis's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '410 Patent.

155.    Cellectis's infringement and the infringement of its contractual partners including, without limitation, AstraZeneca, has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from Defendants' wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

156.    As a result of Cellectis's ongoing infringement and the ongoing infringement of its contractual partners including, without limitation, AstraZeneca, Factor has been and will continue

to be irreparably harmed. Unless Defendants, their agents, or any other person acting on their behalf are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 3
### (Declaratory Judgment of Infringement of the '410 Patent by Cellectis)

157. Each of the preceding paragraphs 1–156 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

158. The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case of actual controversy between Factor on the one hand and Cellectis on the other regarding Cellectis's liability for infringement of the '410 Patent.

159. On information and belief, upon regulatory approval by FDA, Cellectis will infringe, literally or under the doctrine of equivalents, at least one of the claims of the '410 Patent, pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), by making, using, selling, or offering to sell within the United States or importing into the United States products comprising gene-edited cells, including Cellectis's UCARTs and gene-edited cells used in Cellectis's .HEAL gene therapies, developed and/or manufactured using Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

160. As a result of Cellectis's infringement, Factor will be irreparably harmed. Unless Cellectis and any other party acting on its behalf or as an agent thereof are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 4
### (Direct Infringement of the '738 Patent by Cellectis)

161. Each of the preceding paragraphs 1–160 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

162. On information and belief, Cellectis has infringed and will continue to infringe,

literally or under the doctrine of equivalents, at least one of the claims of Factor's '738 Patent, pursuant to 35 U.S.C. § 271(a), by making, using, selling, or offering to sell within the United States or importing into the United States gene-edited cells, *e.g.* Cellectis's UCART cells and cells for use in .HEAL therapies as well as AstraZeneca's announced allogeneic CAR-T cells, and/or AstraZeneca's announced potential *in vivo* gene therapy without authority from Factor. Cellectis has also infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of Factor's '738 Patent, pursuant to 35 U.S.C. § 271(a), by using Factor's patented synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based gene-editing products by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

163.    Cellectis's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '738 Patent.

164.    Cellectis's infringement has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from Cellectis's wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

165.    As a result of Cellectis's ongoing infringement, Factor has been and will continue to be irreparably harmed. Unless Cellectis is enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 5
### (Indirect Infringement of the '738 Patent by Cellectis)

166.    Each of the preceding paragraphs 1–165 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

167.    On information and belief, Cellectis has infringed and will continue to infringe,

literally or under the doctrine of equivalents, at least one of the claims of the '738 Patent, pursuant to 35 U.S.C. § 271(b) and/or (c).

168.    Pursuant to its various agreements, Cellectis has and will continue to cause its contractual partners including, without limitation, AstraZeneca, to use Cellectis's infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

169.    Cellectis intends that its contractual partners including, without limitation, AstraZeneca, will use such infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies and does so with the knowledge and specific intent to induce such direct infringement by its contractual partners including, without limitation, AstraZeneca.

170.    Pursuant to its various agreements, Cellectis has and will continue to cause its contractual partners including, without limitation, AstraZeneca, to use Cellectis's infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

171.    Cellectis intends that its contractual partners including, without limitation, AstraZeneca, will use such infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic

CAR-T cells and/or potential TALEN-based *in vivo* gene therapies and does so with the knowledge and specific intent to induce such direct infringement by its contractual partners including, without limitation, AstraZeneca.

172.    Pursuant to its various agreements, Cellectis has and will continue to supply its contractual partners including, without limitation, AstraZeneca, with materials, including without limitation, synthetic mRNA encoding TALENS, that constitute material components of the infringing methods of utilizing such synthetic-mRNA-based TALENs to produce gene-edited cells. Additionally, CSA has and will continue to import such materials into the United States for use as material components of the infringing methods of utilizing such synthetic-mRNA-based TALENs to produce gene-edited cells by CI in connection with CI's use of the infringing methods both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies at its New York, NY facilities.

173.    Pursuant to its various agreements, Cellectis supplies such materials to CI and Cellectis's contractual partners including, without limitation, AstraZeneca, knowing that such materials are specifically made and adapted for uses by such contractual partners that directly infringe Factor's claimed methods. Such materials are not staple articles of commerce suitable for substantial non-infringing uses, but rather are highly specialized tools engineered at a genetic level to do one thing – to cause target cells to produce TALENs for the purpose of editing the genes of the target cell in a manner that directly infringes the claims of the '738 Patent.

174.    Cellectis specifically intends that CI and Cellectis's contractual partners including, without limitation, AstraZeneca, will use such materials as material components of methods that employ Cellectis's infringing synthetic-mRNA-based TALEN technology both as a research tool

as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies.

175.    Cellectis's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '738 Patent.

176.    Cellectis's infringement and the infringement of its contractual partners including, without limitation, AstraZeneca, has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from Defendants' wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

177.    As a result of Cellectis's ongoing infringement and the ongoing infringement of its contractual partners including, without limitation, AstraZeneca, Factor has been and will continue to be irreparably harmed. Unless Defendants, their agents, or any other person acting on their behalf are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 6
### (Declaratory Judgment of Infringement of the '738 Patent by Cellectis)

178.    Each of the preceding paragraphs 1–177 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

179.    The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case of actual controversy between Factor on the one hand and Cellectis on the other regarding Cellectis's liability for infringement of the '738 Patent.

180.    On information and belief, upon regulatory approval by FDA, Cellectis will infringe, literally or under the doctrine of equivalents, at least one of the claims of the '738 Patent, pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), by making, using, selling, or offering to sell within the United States or importing into the United States products comprising gene-edited cells, including Cellectis's UCARTs and gene-edited cells used in Cellectis's .HEAL gene therapies,

developed and/or manufactured using Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

181.    As a result of Cellectis's infringement, Factor will be irreparably harmed. Unless Cellectis and any other party acting on its behalf or as an agent thereof are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 7
### (Direct Infringement of the '229 Patent by Cellectis)

182.    Each of the preceding paragraphs 1–181 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

183.    On information and belief, Cellectis has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of Factor's '229 Patent, pursuant to 35 U.S.C. § 271(a), by making, using, selling, or offering to sell within the United States or importing into the United States gene-edited cells, *e.g.* Cellectis's UCART cells and cells for use in .HEAL therapies as well as AstraZeneca's announced allogeneic CAR-T cells, and/or AstraZeneca's announced potential *in vivo* gene therapy without authority from Factor. Cellectis has also infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of Factor's '229 Patent, pursuant to 35 U.S.C. § 271(a), by using Factor's patented synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based gene-editing products by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

184.    Cellectis's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '229 Patent.

185.    Cellectis's infringement has damaged and will continue to damage Factor, which is

entitled to recover the damages resulting from Cellectis's wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

186.    As a result of Cellectis's ongoing infringement, Factor has been and will continue to be irreparably harmed. Unless Cellectis is enjoined by this Court, Factor will continue to suffer such irreparable harm.

### CLAIM 8
### (Indirect Infringement of the '229 Patent by Cellectis)

187.    Each of the preceding paragraphs 1–186 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

188.    On information and belief, Cellectis has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of the '229 Patent, pursuant to 35 U.S.C. § 271(b) and/or (c).

189.    Pursuant to its various agreements, Cellectis has and will continue to cause its contractual partners including, without limitation, AstraZeneca, to use Cellectis's infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

190.    Pursuant to its various agreements, Cellectis has and will continue to cause its contractual partners including, without limitation, AstraZeneca, to use Cellectis's infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

191.    Cellectis intends that its contractual partners including, without limitation, AstraZeneca, will use such infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies and does so with the knowledge and specific intent to induce such direct infringement by its contractual partners including, without limitation, AstraZeneca.

192.    Pursuant to its various agreements, Cellectis has and will continue to supply its contractual partners including, without limitation, AstraZeneca, with materials, including without limitation, synthetic mRNA encoding TALENs, that constitute material components of the infringing methods of utilizing such synthetic-mRNA-based TALENs to produce gene-edited cells. Additionally, CSA has and will continue to import such materials into the United States for use as material components of the infringing methods of utilizing such synthetic-mRNA-based TALENs to produce gene-edited cells by CI in connection with CI's use of the infringing methods both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies at its New York, NY facilities.

193.    Pursuant to its various agreements, Cellectis supplies such materials to CI and Cellectis's contractual partners including, without limitation, AstraZeneca, knowing that such materials are specifically made and adapted for uses by such contractual partners that directly infringe Factor's claimed methods. Such materials are not staple articles of commerce suitable for substantial non-infringing uses, but rather are highly specialized tools engineered at a genetic level to do one thing – to cause target cells to produce TALENs for the purpose of editing the genes of the target cell in a manner that directly infringes the claims of the '229 Patent.

194.    Cellectis specifically intends that CI and Cellectis's contractual partners including, without limitation, AstraZeneca, will use such materials as material components of methods that employ Cellectis's infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells and/or potential TALEN-based *in vivo* gene therapies.

195.    Cellectis's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '229 Patent.

196.    Cellectis's infringement and the infringement of its contractual partners including, without limitation, AstraZeneca, has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from Defendants' wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

197.    As a result of Cellectis's ongoing infringement and the ongoing infringement of its contractual partners including, without limitation, AstraZeneca, Factor has been and will continue to be irreparably harmed. Unless Defendants, their agents, or any other person acting on their behalf are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 9
### (Declaratory Judgment of Infringement of the '229 Patent by Cellectis)

198.    Each of the preceding paragraphs 1–197 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

199.    The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case of actual controversy between Factor on the one hand and Cellectis on the other regarding Cellectis's liability for infringement of the '229 Patent.

200.    On information and belief, upon regulatory approval by FDA, Cellectis will infringe, literally or under the doctrine of equivalents, at least one of the claims of the '229 Patent,

pursuant to 35 U.S.C. § 271(a), (b), (c), and/or (g), by making, using, selling, or offering to sell within the United States or importing into the United States products comprising gene-edited cells, including Cellectis's UCARTs and gene-edited cells used in Cellectis's .HEAL gene therapies, developed and/or manufactured using Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

201.    As a result of Cellectis's infringement, Factor will be irreparably harmed. Unless Cellectis and any other party acting on its behalf or as an agent thereof are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 10
### (Direct Infringement of the '410 Patent by AstraZeneca)

202.    Each of the preceding paragraphs 1–201 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

203.    On information and belief, AstraZeneca has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of Factor's '410 Patent, pursuant to 35 U.S.C. § 271(a) and/or (g), by making, using, selling, or offering to sell within the United States or importing into the United States AstraZeneca's announced gene-edited allogeneic CAR-T cells, and/or AstraZeneca's announced TALEN-based potential *in vivo* gene therapy by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

204.    AstraZeneca's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '410 Patent.

205.    AstraZeneca's infringement has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from AstraZeneca's wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

206.    As a result of AstraZeneca's ongoing infringement, Factor has been and will continue to be irreparably harmed. Unless AstraZeneca is enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 11
### (Indirect Infringement of the '410 Patent by AstraZeneca)

207.    Each of the preceding paragraphs 1–206 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

208.    On information and belief, AstraZeneca has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of the '410 Patent, pursuant to 35 U.S.C. § 271(b), by actively inducing Cellectis to use its infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells on AstraZeneca's behalf and for AstraZeneca's benefit pursuant to the AstraZeneca Collaboration Agreement, including AstraZeneca's announced gene-edited allogeneic CAR-T cells, and/or AstraZeneca's announced TALEN-based potential *in vivo* gene therapy by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

209.    AstraZeneca intends that Cellectis will use such infringing synthetic-mRNA-based TALEN technology on behalf of and for the benefit of AstraZeneca and does so with the knowledge and specific intent to induce such direct infringement by Cellectis.

210.    AstraZeneca's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '410 Patent.

211.    AstraZeneca's infringement and Cellectis's infringement on behalf of and for the benefit of AstraZeneca has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from Defendants' wrongful acts in an amount to be determined at

trial, and in any event no less than a reasonable royalty.

212.    As a result of AstraZeneca's and Cellectis's ongoing infringement, Factor has been and will continue to be irreparably harmed. Unless Defendants, their agents, or any other person acting on their behalf are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 12
### (Declaratory Judgment of Infringement of the '410 Patent by AstraZeneca)

213.    Each of the preceding paragraphs 1–212 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

214.    The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case of actual controversy between Factor on the one hand and AstraZeneca on the other regarding AstraZeneca's liability for infringement of the '410 Patent.

215.    On information and belief, upon regulatory approval by FDA, AstraZeneca will infringe, literally or under the doctrine of equivalents, at least one of the claims of the '410 Patent, pursuant to 35 U.S.C. § 271(a) and/or (g), by making, using, selling, or offering to sell within the United States or importing into the United States products comprising gene-edited cells, including AstraZeneca's announced potential allogeneic CAR-T cells, and/or AstraZeneca's announced potential *in vivo* gene therapies, developed and/or manufactured using Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

216.    As a result of Cellectis's infringement, Factor will be irreparably harmed. Unless Cellectis and any other party acting on its behalf or as an agent thereof are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 13
### (Direct Infringement of the '738 Patent by AstraZeneca)

217.    Each of the preceding paragraphs 1–216 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

218.    On information and belief, AstraZeneca has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of Factor's '738 Patent, pursuant to 35 U.S.C. § 271(a) and/or (g), by making, using, selling, or offering to sell within the United States or importing into the United States AstraZeneca's announced gene-edited allogeneic CAR-T cells, and/or AstraZeneca's announced TALEN-based potential *in vivo* gene therapy by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

219.    AstraZeneca's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '410 Patent.

220.    AstraZeneca's infringement has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from AstraZeneca's wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

221.    As a result of AstraZeneca's ongoing infringement, Factor has been and will continue to be irreparably harmed. Unless AstraZeneca is enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 14
### (Indirect Infringement of the '738 Patent by AstraZeneca)

222.    Each of the preceding paragraphs 1–221 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

223.    On information and belief, AstraZeneca has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of the '738 Patent, pursuant

to 35 U.S.C. § 271(b), by actively inducing Cellectis to use its infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells on AstraZeneca's behalf and for AstraZeneca's benefit pursuant to the AstraZeneca Collaboration Agreement, including AstraZeneca's announced gene-edited allogeneic CAR-T cells, and/or AstraZeneca's announced TALEN-based potential *in vivo* gene therapy by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

224.    AstraZeneca intends that Cellectis will use such infringing synthetic-mRNA-based TALEN technology on behalf of and for the benefit of AstraZeneca and does so with the knowledge and specific intent to induce such direct infringement by Cellectis.

225.    AstraZeneca's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '738 Patent.

226.    AstraZeneca's infringement and Cellectis's infringement on behalf of and for the benefit of AstraZeneca has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from Defendants' wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

227.    As a result of AstraZeneca's and Cellectis's ongoing infringement, Factor has been and will continue to be irreparably harmed. Unless Defendants, their agents, or any other person acting on their behalf are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 15
### (Declaratory Judgment of Infringement of the '738 Patent by AstraZeneca)

228.    Each of the preceding paragraphs 1–227 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

229.    The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case of actual controversy between Factor on the one hand and AstraZeneca on the other regarding AstraZeneca's liability for infringement of the '738 Patent.

230.    On information and belief, upon regulatory approval by FDA, AstraZeneca will infringe, literally or under the doctrine of equivalents, at least one of the claims of the '738 Patent, pursuant to 35 U.S.C. § 271(a) and/or (g), by making, using, selling, or offering to sell within the United States or importing into the United States products comprising gene-edited cells, including AstraZeneca's announced potential allogeneic CAR-T cells, and/or AstraZeneca's announced potential *in vivo* gene therapies, developed and/or manufactured using Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

231.    As a result of Cellectis's infringement, Factor will be irreparably harmed. Unless Cellectis and any other party acting on its behalf or as an agent thereof are enjoined by this Court, Factor will continue to suffer such irreparable harm.

**CLAIM 16**
**(Direct Infringement of the '229 Patent by AstraZeneca)**

232.    Each of the preceding paragraphs 1–231 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

233.    On information and belief, AstraZeneca has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of Factor's '229 Patent, pursuant to 35 U.S.C. § 271(a) and/or (g), by making, using, selling, or offering to sell within the United States or importing into the United States AstraZeneca's announced gene-edited allogeneic CAR-T cells, and/or AstraZeneca's announced TALEN-based potential *in vivo* gene therapy by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority

from Factor.

234.    AstraZeneca's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '229 Patent.

235.    AstraZeneca's infringement has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from AstraZeneca's wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

236.    As a result of AstraZeneca's ongoing infringement, Factor has been and will continue to be irreparably harmed. Unless AstraZeneca is enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 17
## (Indirect Infringement of the '229 Patent by AstraZeneca)

237.    Each of the preceding paragraphs 1–236 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

238.    On information and belief, AstraZeneca has infringed and will continue to infringe, literally or under the doctrine of equivalents, at least one of the claims of the '229 Patent, pursuant to 35 U.S.C. § 271(b), by actively inducing Cellectis to use its infringing synthetic-mRNA-based TALEN technology both as a research tool as well as for research to identify and design gene-edited cells, including allogeneic CAR-T cells on AstraZeneca's behalf and for AstraZeneca's benefit pursuant to the AstraZeneca Collaboration Agreement, including AstraZeneca's announced gene-edited allogeneic CAR-T cells, and/or AstraZeneca's announced TALEN-based potential *in vivo* gene therapy by utilizing Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

239.    AstraZeneca intends that Cellectis will use such infringing synthetic-mRNA-based TALEN technology on behalf of and for the benefit of AstraZeneca and does so with the

knowledge and specific intent to induce such direct infringement by Cellectis.

240.    AstraZeneca's infringement is willful and was made with knowledge of and with the specific intent to infringe the claims of the '229 Patent.

241.    AstraZeneca's infringement and Cellectis's infringement on behalf of and for the benefit of AstraZeneca has damaged and will continue to damage Factor, which is entitled to recover the damages resulting from Defendants' wrongful acts in an amount to be determined at trial, and in any event no less than a reasonable royalty.

242.    As a result of AstraZeneca's and Cellectis's ongoing infringement, Factor has been and will continue to be irreparably harmed. Unless Defendants, their agents, or any other person acting on their behalf are enjoined by this Court, Factor will continue to suffer such irreparable harm.

## CLAIM 18
### (Declaratory Judgment of Infringement of the '229 Patent by AstraZeneca)

243.    Each of the preceding paragraphs 1–242 is repeated, re-alleged and re-incorporated by reference as if fully set forth herein.

244.    The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case of actual controversy between Factor on the one hand and AstraZeneca on the other regarding AstraZeneca's liability for infringement of the '229 Patent.

245.    On information and belief, upon regulatory approval by FDA, AstraZeneca will infringe, literally or under the doctrine of equivalents, at least one of the claims of the '229 Patent, pursuant to 35 U.S.C. § 271(a) and/or (g), by making, using, selling, or offering to sell within the United States or importing into the United States products comprising gene-edited cells, including AstraZeneca's announced potential allogeneic CAR-T cells, and/or AstraZeneca's announced

potential *in vivo* gene therapy, developed and/or manufactured using Cellectis's infringing synthetic-mRNA-based TALEN technology, without authority from Factor.

246.    As a result of Cellectis's infringement, Factor will be irreparably harmed. Unless Cellectis and any other party acting on its behalf or as an agent thereof are enjoined by this Court, Factor will continue to suffer such irreparable harm.

<h3 align="center">PRAYER FOR RELIEF</h3>

WHEREFORE, Plaintiff prays for a judgment in its favor and against Defendants and respectfully requests the following relief:

(a)   A judgment that Defendants have directly infringed the '410 Patent and continue to do so;

(b)   A judgment that Defendants have directly infringed the '738 Patent and continue to do so;

(c)   A judgment that Defendants have directly infringed the '229 Patent and continue to do so;

(d)   A judgment that Defendants have indirectly infringed the '410 Patent and continue to do so;

(e)   A judgment that Defendants have indirectly infringed the '738 Patent and continue to do so;

(f)   A judgment that Defendants have indirectly infringed the '229 Patent and continue to do so;

(g)   A declaration that any product approved for marketing developed or manufactured using Cellectis's synthetic-mRNA-based TALEN technology that is made, used, sold, offered for sale in, or is imported into, the United States will infringe the '410 Patent;

(h)   A declaration that any product approved for marketing developed or manufactured

66

using Cellectis's synthetic-mRNA-based TALEN technology that is made, used, sold, offered for sale in, or is imported into, the United States will infringe the '738 Patent;

(i)    A declaration that any product approved for marketing developed or manufactured using Cellectis's synthetic-mRNA-based TALEN technology that is made, used, sold, offered for sale in, or is imported into, the United States will infringe the '229 Patent;

(j)    Damages or other monetary relief, including post-judgment monetary relief with an accounting as needed and pre- and post-judgment interest;

(k)    An order preliminarily and permanently enjoining Cellectis, AstraZeneca, their officers, agents, representatives, affiliates, and anyone in privity thereto from undertaking any act constituting further infringement of any of the Angel Patents;

(l)    An award, in lieu of a permanent injunction, of an ongoing royalty;

(m)    A judgment that Defendants' infringement is willful and awarding enhanced damages in an amount up to treble the amount of compensatory damages as justified under 35 U.S.C. § 284 and/or Rule 54(d) of the Federal Rules of Civil Procedure;

(n)    A declaration that this case is exceptional within the meaning of 35 U.S.C. § 285, and awarding Plaintiff its costs, expenses, and reasonable attorney fees under 35 U.S.C.§ 285 and all other applicable statutes and rules in common law as may apply; and

(o)    An order awarding Factor any such other relief as the Court may deem just and proper under the circumstances.

Dated: September 26, 2025

Respectfully submitted,

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

_Anne Shea Gaza_
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
302.571.6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Plaintiff Factor Bioscience Inc.*

OF COUNSEL:

GEMINI LAW LLP

Robert V. Cerwinski
Michael W. Johnson
Lora M. Green
Eric L. Saunders
Zachary S. Travis
Jason N. Zaccaro
32 W 39th Street
New York, NY 10018
(917) 915-8832
rcerwinski@geminilaw.com
mjohnson@geminilaw.com
lgreen@geminilaw.com
esaunders@geminilaw.com
ztravis@geminilaw.com
jzaccaro@geminilaw.com

GOODWIN PROCTER LLP

Huiya Wu
Linnea P. Cipriano
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
HWu@goodwinlaw.com
LCipriano@goodwinlaw.com